### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

ROXANNE CRIBBS RINGER, on behalf of herself and on
behalf of her minor child, E.R.; JOHN FUECHSEL, on
behalf of himself and on behalf of his minor children, E.F.
and M.F.; AMBER RAINEY, on behalf of herself and on
behalf of her minor child, K.R.; LENEE BIEN-WILLNER,
on behalf of herself and on behalf of her minor children,
E.B.W., P.B.W., and A.B.W.; JEREMY HALLAND, on
behalf of himself and on behalf of his minor children, N.H.
and S.H.; KIMBERLY INMON, on behalf of herself and on
behalf of her minor child, T.L.; REV. KRISTIN KLADE
AND JOHN KLADE, on behalf of themselves and on
behalf of their minor children, F.K. and W.K.; WHITNEY
LAWRENCE, on behalf of herself and on behalf of her
minor children, J.L. and L.L.; MICHELLE LEWIS, on
behalf of herself and on behalf of her minor child, C.L.;
NICHOLE MANNING, on behalf of herself and on behalf
of her minor children, A.M. and D.J.; MICHAEL OLSON,
on behalf of himself and on behalf of his minor child, R.O.;
SHANNON OLSON, on behalf of herself and on behalf of
her minor child, R.D.; PATRICIA RUIZ, on behalf of
herself and on behalf of her minor child, J.R.; DANIEL
SULLIVAN AND SINJITA SULLIVAN, on behalf of
themselves and on behalf of their minor children, R.S. and
N.S.; MARNEIGH URBAN; on behalf of herself and on
behalf of her minor child, E.S.; MARIBEL VILLARREAL,
on behalf of herself and on behalf of her minor children,
E.G. and E.R.G.,

      Plaintiffs,
        v.

COMAL INDEPENDENT SCHOOL DISTRICT;
GEORGETOWN INDEPENDENT SCHOOL DISTRICT;
CONROE INDEPENDENT SCHOOL DISTRICT; FLOUR
BLUFF INDEPENDENT SCHOOL DISTRICT; FORT
WORTH INDEPENDENT SCHOOL DISTRICT;
ARLINGTON INDEPENDENT SCHOOL DISTRICT;
MCKINNEY INDEPENDENT SCHOOL DISTRICT;
FRISCO INDEPENDENT SCHOOL DISTRICT;
NORTHWEST INDEPENDENT SCHOOL DISTRICT;

CIVIL ACTION NO.

 25-cv-1181

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

AZLE INDEPENDENT SCHOOL DISTRICT;
ROCKWALL INDEPENDENT SCHOOL DISTRICT;
LOVEJOY INDEPENDENT SCHOOL DISTRICT;
MANSFIELD INDEPENDENT SCHOOL DISTRICT; and
MCALLEN INDEPENDENT SCHOOL DISTRICT,

     Defendants.

## **COMPLAINT**

1.     Consistent with Texas law requiring parents to send their minor children to school, upwards of 5.5 million students are enrolled in more than 9,000 public elementary and secondary schools across the state. These children and their families adhere to an array of faiths, and many do not practice any religion at all. Nevertheless, because of Senate Bill No. 10 ("S.B. 10" or "the Act"), which requires public schools to post a state-approved, Protestant version of the Ten Commandments in a "conspicuous place" in every classroom, all of these students will be forcibly subjected to scriptural dictates, day in and day out, including: "I AM the LORD thy God"; "Thou shalt have no other gods before me"; "Thou shalt not make to thyself any graven images"; "Thou shalt not take the Name of the Lord thy God in vain"; "Remember the Sabbath day, to keep it holy"; and "Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee." This simply cannot be reconciled with the fundamental religious-freedom principles that animated the Founding of our nation.

2.     These Founding principles are reflected in a long line of Supreme Court jurisprudence that prohibits public schools from imposing religious doctrine and practice on students. Indeed, for nearly half a century, it has been well settled that the First Amendment forbids public schools from permanently posting the Ten Commandments in this manner. In *Stone v. Graham*, 449 U.S. 39, 42 (1980), the Supreme Court struck down a Kentucky law mandating

classroom displays of the Ten Commandments, holding that such displays would unconstitutionally "induce [ ] schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments."

3.    Last month, this district court ruled that S.B. 10 is "plainly unconstitutional" and likely violates the Establishment and Free Exercise Clauses of the First Amendment. *See Nathan v. Alamo Heights Indep. Sch. Dist.*, No. 25-cv-00756, 2025 WL 2417589, at *28 (W.D. Tex. Aug. 20, 2025) (cleaned up). And in June, the U.S Court of Appeals for the Fifth Circuit held the same regarding a Louisiana statute similar to S.B. 10. *See Roake v. Brumley*, 141 F. 4th 614, 645 (5th Cir. 2025). *Nathan* and *Roake* reflect binding Supreme Court precedent, including *Stone*; *Lee v. Weisman*, 505 U.S. 577 (1992); *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022); and most recently, *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025).

4.    Despite these precedents, the Defendant School Districts have pressed forward with actually posting S.B. 10 displays in classrooms, or have confirmed they will do so shortly—even after receiving a letter from plaintiffs' counsel in *Nathan* notifying them of the *Nathan* court's ruling and warning that *all* school districts have an independent legal obligation to comply with the ruling and avoid violating children's and parents' First Amendment rights.

5.    As in *Nathan* and *Roake*, permanently posting the Ten Commandments in every public-school classroom—rendering them unavoidable—will unconstitutionally harm the Plaintiffs. The displays will pressure students, including the minor-child Plaintiffs, into religious observance, veneration, and adoption of the state's favored religious scripture. The displays will also send the harmful and religiously divisive message that students who do not subscribe to the Ten Commandments—or, more precisely, to the specific version of the Ten Commandments that S. B. 10 requires—do not belong in their own school community, pressuring them to refrain from

expressing any faith practices or beliefs that are not aligned with the state's religious preferences. And the displays will substantially interfere with and burden the right of the parents-Plaintiffs, who are Jewish, Christian, Hindu, Baha'i, Humanist, or nonreligious, to direct their children's education and upbringing when it comes to religious questions and matters.

6.      The state's main interest in displaying the Ten Commandments in public schools under S.B. 10 is to impose specific religious beliefs on public-school children, in disregard for the numerous objections from Texas families and faith leaders from across the religious spectrum. As Lt. Gov. Dan Patrick, who presides over the Texas Senate, put it: Because of S.B. 10, students "in every classroom in Texas, they are going to see the Ten Commandments, and they are going to know about God." Sen. Phil King, S.B. 10's lead Senate sponsor and author, echoed the sentiment, explaining: "[W]e want every kid, [pre-k] through twelve, every day, in every classroom they sit in to look on the wall and read . . . those words that [] God says because we want them to understand how important that those statements of God, those rules of God are that they see them in their classroom every single day of their public education."

7.      For these reasons, Plaintiffs seek a declaratory judgment that S.B. 10 is unconstitutional. Plaintiffs also seek a temporary restraining order and preliminary injunction, as well as permanent injunctive relief, to prevent Defendants from complying with the Act.

## JURISDICTION & VENUE

8.      Plaintiffs bring this matter under 42 U.S.C. § 1983, for violations of civil rights under the First and Fourteenth Amendments to the U.S. Constitution. Because this action arises under the U.S. Constitution and the laws of the United States, it presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331. In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3).

9.      The Court is authorized to award the declaratory and injunctive relief requested by Plaintiffs pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Western District of Texas. Plaintiffs Roxanne Cribbs Ringer, John Fuechsel, and Amber Rainey reside in this district, and their minor-children Plaintiffs attend public schools in this district.

11.     All Defendants are located within the state of Texas. Defendants Comal Independent School District and Georgetown Independent School District are located within this district. Accordingly, the actions to administer, implement, and enforce S.B. 10 by the Defendants that give rise to the claims herein will necessarily occur in large part within this district.

## PARTIES

12.     Plaintiff Roxanne Cribbs Ringer brings this suit on behalf of herself and on behalf of her minor child, E.R.[1] The family is domiciled in Comal County, Texas. E.R. is enrolled in and attends a public elementary school in the Comal Independent School District for the 2025-2026 school year.

13.     Plaintiff John Fuechsel brings this suit on behalf of himself and on behalf of his minor children, E.F. and M.F. The family is domiciled in Comal County, Texas. E.F. and M.F. are enrolled in and attend a public elementary and middle school in the Comal Independent School District for the 2025-2026 school year.

14.     Plaintiff Amber Rainey brings this suit on behalf of herself and on behalf of her minor child, K.R. The family is domiciled in Williamson County, Texas. K.R. is enrolled in and attends a public high school in the Georgetown Independent School District for the 2025-2026

---

[1] In accordance with Federal Rule of Civil Procedure 5.2(a)(3), all minor-child Plaintiffs are identified by their initials.

school year.

15.    Plaintiff Lenee Bien-Willner brings this suit on behalf of herself and on behalf of her minor children, E.B.W., P.B.W., and A.B.W. The family is domiciled in Montgomery County, Texas. E.B.W., P.B.W., and A.B.W. are enrolled in and attend public elementary and middle schools in the Conroe Independent School District for the 2025-2026 school year.

16.    Plaintiff Jeremy Halland brings this suit on behalf of himself and on behalf of his minor children, N.H. and S.H. The family is domiciled in Montgomery County, Texas. N.H. and S.H. are enrolled in and attend a public intermediate and elementary school, respectively, in the Conroe Independent School District for the 2025-2026 school year.

17.    Plaintiff Kimberly Inmon brings this suit on behalf of herself and on behalf of her minor child, T.L. The family is domiciled in Nueces County, Texas. T.L. is enrolled in and attends a public school in the Flour Bluff Independent School District during the 2025-2026 school year.

18.    Plaintiffs Reverend Kristin Klade and John Klade bring this suit on behalf of themselves and on behalf of their minor children, F.K. and W.K. The family lives in Tarrant County, Texas. F.K. and W.K. are enrolled in and attend a public elementary school in the Fort Worth Independent School District for the 2025-2026 school year.

19.    Plaintiff Whitney Lawrence brings this suit on behalf of herself and on behalf of her minor children, J.L and L.L. The family is domiciled in Tarrant County, Texas. J.L. and L.L. are enrolled in and attend a public elementary school in the Arlington Independent School District for the 2025-2026 school year.

20.    Plaintiff Michelle Lewis brings this suit on behalf of herself and on behalf of her minor child, C.L. The family is domiciled in Collin County, Texas. C.L. is enrolled in and attends

a public elementary school in the McKinney Independent School District for the 2025-2026 school year.

21.     Plaintiff Nichole Manning brings this suit on behalf of herself and on behalf of her minor children, A.M. and D.J. The family is domiciled in Collin County, Texas. A.M. and D.J. are enrolled in and attend a public high and elementary school, respectively, in the Frisco Independent School District for the 2025-2026 school year.

22.     Plaintiff Michael Olson brings this suit on behalf of himself and on behalf of his minor child, R.O. The family is domiciled in Tarrant County, Texas. R.O. is enrolled in and attends a public elementary school in the Northwest Independent School District for the 2025-2026 school year.

23.     Plaintiff Shannon Olson brings this suit on behalf of herself and on behalf of her minor child, R.D. The family is domiciled in Tarrant County, Texas. R.D. is enrolled in and attends a public school in the Azle Independent School District for the 2025-2026 school year.

24.     Plaintiff Patricia Ruiz brings this suit on behalf of herself and her minor child, J.R. The family is domiciled in Rockwall County, Texas. J.R. is enrolled in and attends a public elementary school in the Rockwall Independent School District for the 2025-2026 school year.

25.     Plaintiffs Daniel Sullivan and Sinjita Sullivan bring this suit on behalf of themselves and on behalf of their minor children, R.S. and N.S. The family is domiciled in Collin County, Texas. R.S. and N.S. are in enrolled in and attend public schools in the Lovejoy Independent School District for the 2025-2026 school year.

26.     Plaintiff Marneigh Urban brings this suit on behalf of herself and on behalf of her minor child, E.S. The family is domiciled in Tarrant County, Texas. E.S. is enrolled in and attends

a public elementary school in the Mansfield Independent School District for the 2025-2026 school year.

27.    Plaintiff Maribel Villarreal brings this suit on behalf of herself and on behalf of her minor children, E.G. and E.R.G. The family is domiciled in Hidalgo County, Texas. E.G. and E.R.G. are enrolled in and attend a public elementary and high school, respectively, in the McAllen Independent School District for the 2025-2026 school year.

28.    Defendant Comal Independent School District is a public school district located in New Braunfels, Texas.

29.    Defendant Georgetown Independent School District is a public school district located in Georgetown, Texas.

30.    Defendant Conroe Independent School District is a public school district located in Conroe, Texas.

31.    Defendant Flour Bluff Independent School District is a public school district located in Corpus Christi, Texas.

32.    Defendant Fort Worth Independent School District is a public school district located in Fort Worth, Texas.

33.    Defendant Arlington Independent School District is a public school district located in Arlington, Texas.

34.    Defendant McKinney Independent School District is a public school district located in McKinney, Texas.

35.    Defendant Frisco Independent School District is a public school district located in Frisco, Texas.

36.     Defendant Northwest Independent School District is a public school district located in Justin, Texas.

37.     Defendant Azle Independent School District is a public school district located in Azle, Texas.

38.     Defendant Rockwall Independent School District is a public school district located in Rockwall, Texas.

39.     Defendant Lovejoy Independent School District is a public school district located in Allen, Texas.

40.     Defendant Mansfield Independent School District is a public school district located in Mansfield, Texas.

41.     Defendant McAllen Independent School District is a public school district located in McAllen, Texas.

## FACTUAL ALLEGATIONS

42.     On June 20, 2025, Texas Governor Greg Abbott signed into law S.B. 10, which provides that every public elementary and secondary school in the state "shall display in a conspicuous place in each classroom of the school a durable poster or framed copy of the Ten Commandments[.]" The Act took effect on September 1, 2025.

43.     Under the Act, the poster or framed copy "must . . . include only the text of the Ten Commandments as provided by Subsection (c)," which states:

The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

9

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

44.     As alleged further below, *infra* ¶¶ 53–65, this version of the Ten Commandments is associated with certain Protestant faiths and conflicts with the version of the Ten Commandments followed by many Jews and Catholics.

45.     The Act further requires that each poster or copy of the Ten Commandments "be at least" sixteen inches by twenty inches in size and that the text of the Ten Commandments be printed "in a size and typeface that is legible to a person with average vision from anywhere in the classroom[.]"

46.     Under the Act, the required displays will be donated to schools. A school lacking compliant displays in each classroom also "may, but is not required to, purchase posters or copies . . . using district funds."

47.     The displays will be permanent and year-round; the Act does not provide for a time limit on the displays.

48.     The Act requires that the displays of the Ten Commandments be posted in all classrooms. There are no exceptions. The Act states: "Notwithstanding any other law, a public elementary or secondary school is not exempt from this section."

49.     The Act requires the displays to be placed in every classroom, regardless of the subject matter taught. For example, the Act requires the state-approved version of the Ten Commandments to be posted in math and science classrooms. Thus, all students, including those who move classrooms during the school day and those who stay in the same classroom for much of the school day, will be subjected the displays at all times they are in class, no matter the topic or other instruction at hand.

50.     Although a Kentucky statute similar to S.B. 10 struck down in *Stone* and the Louisiana law held unconstitutional in *Roake* each required an accompanying context statement that purported to explain the historical relevance and use of the Ten Commandments, S.B. 10 does not include a similar provision.

51.     In fact, this nation's core Founding documents—the Declaration of Independence, the United States Constitution, and the Bill of Rights—were not based on the Ten Commandments, and there is no longstanding history or tradition of prominently and permanently displaying the Ten Commandments in public-school classrooms.

52.     As evinced by the Act's minimum requirements for the classroom displays and comments made by various lawmakers, *see infra* ¶¶ 79–87, the state's main interest in enacting S.B. 10 is the imposition of religious beliefs and tenets on public-school children.

**The Act Officially Approves and Prescribes One Particular Version of the Ten Commandments, to Which Many People Do Not Subscribe.**

53.     S.B. 10 is not neutral with respect to religion. By design, it expressly requires the display of religious scripture—the Ten Commandments—in every public-school classroom. It also

requires that schools post a specific, state-approved version of that scripture that is associated with certain Protestant faiths, weighing in on theological questions regarding the correct content and meaning of the Ten Commandments and enshrining in state law an official denominational preference. Thus, the *Nathan* court correctly held that S.B. 10 "impermissibly takes sides on theological questions and officially favors Christian denominations over others." 2025 WL 2417589, at *27.

54.    Numerous Texans do not subscribe to the specific text of the Ten Commandments that is mandated by S.B. 10.

55.    Many people in Texas are nonreligious and do not adhere to the religious tenets set forth in any version of the Ten Commandments, including the one mandated by S.B. 10.

56.    There are many faith traditions that do not teach, recognize, or reference the Ten Commandments at all. For example, followers of Hinduism, Buddhism, Sikhism, and Taoism generally do not consider the Ten Commandments to be part of their belief system, and certain Commandments directly conflict with the tenets of some of these religions.

57.    Some Christians, including Jehovah's Witnesses, reject the proposition that the Ten Commandments are authoritative or binding.

58.    Some faith traditions, including some Christian denominations, consider the Ten Commandments to be part of their theology and authoritative but do not believe in elevating the Commandments set forth in S.B. 10 over other biblical teachings.

59.    Even for faith traditions that view the Ten Commandments as authoritative and important, there are many different versions, depending on religious denomination and biblical translation.

60.     Among those who may believe in some version of the Ten Commandments, the particular text they follow can differ by religious denomination or tradition. For instance, Catholics, Jews, and many Protestants differ in the way that they number, organize, and translate the Ten Commandments from Hebrew to English.

61.     The text of the Ten Commandments mandated by S.B. 10 is a Protestant version.

62.     The version of the Ten Commandments mandated by the Act does not match versions or translations found in the Jewish tradition.

63.     The version of the Ten Commandments mandated by S.B. 10 omits key language and context that is included in the version set forth in the Torah. For example, it is missing the important message in the Jewish story about God bringing the Israelites out of Egyptian slavery to freedom. It also states "[t]hou shalt not kill," whereas the translated version followed by most Jews prohibits "murder." The different language reflects deep theological differences as to the Ten Commandments' meaning and scope.

64.     The version of the Ten Commandments mandated by S.B. 10 does not match the version followed by most Catholics. For example, the Catholic version of the Ten Commandments, when abridged, typically does not include the language prohibiting "graven images." Indeed, given how common iconography, sculpture, and other artwork is in the Catholic faith, this prohibition conflicts with how many Catholics practice their faith on a day-to-day basis.

65.     Although the version of the Ten Commandments mandated by S.B. 10 is Protestant and is drawn from the King James Bible, the specific text and wording of the Commandments required under S.B. 10 is religiously objectionable even to some adherents of certain Protestant denominations.

**The Displays Mandated By S.B. 10 Will Coerce Students, Including the Minor-Child Plaintiffs, into Religious Observance, Veneration, and Adoption of the State's Official Religious Scripture.**

66. Under Texas law, minor children are required to "attend school each school day for the entire period" that instructional programming is provided. Tex. Educ. Code § 25.085(a).

67. When a student exceeds the number of allowable unexcused absences from school, students and parents may be subject to educational and legal penalties, including civil prosecution in court. *See* Tex. Fam. Code § 65.003(b); Tex. Educ. Code § 25.093(a). Other possible penalties include a "behavior improvement plan," "school-based community service," or a referral to "counseling, mediation, mentoring, a teen court program, community-based services, or other in-school or out-of-school services aimed at addressing the student's truancy." Tex. Educ. Code § 25.0915(a-1)(1)–(2).

68. Further, if a school issues the required attendance warning and the parent, acting with criminal negligence, "fails to require the child to attend school as required by law, and the child has [excessive unexcused] absences . . . the parent commits an offense." *Id.* § 25.093(a). "The attendance officer or other appropriate school official *shall* file a complaint against the parent" in the appropriate court. *Id.* § 25.093(b) (emphasis added).

69. The offense is classified as a misdemeanor punishable by a fine not to exceed $100 "for a first offense," and up to $500 for a "fifth or subsequent offense." *Id.* § 25.093(c). "Each day the child remains out of school may constitute a separate offense." *Id.* § 25.093(c-1). The court also "may order the defendant to attend a program for parents of students with unexcused absences that provides instruction designed to assist those parents in identifying problems that contribute to the students' unexcused absences[.]" *Id.* § 25.093(f). If "a parent refuses to obey a court order . . .

the court may punish the parent for contempt of court[.]" *Id.* § 25.093(g) (citing Tex. Gov't Code § 21.002, which authorizes a fine or confinement in jail for contempt of court).

70.     Consistent with Texas's compulsory education law, more than 5.5 million children are enrolled in more than 9,000 public schools across the state.[2]

71.     These children and their families practice a wide array of faiths. And within these faith systems, students and families adhere to a variety of denominations, branches, and sects.

72.     Many public-school children and families in Texas, including some of the Plaintiffs, do not adhere to any faith and cherish their right to be nonreligious to the same extent that people of faith cherish their right to religious belief and exercise. *See infra* ¶¶ 109–115; 123–127; 137–151; 160–222.

73.     Given the religious diversity present in Texas's public schools, many students and families, including some of the Plaintiffs, do not subscribe to any version of the Ten Commandments. *See infra* ¶¶ 109–115; 123–127; 137–151; 160–222.

74.     Many other public-school students and their families who believe in their faith's version of the Ten Commandments, including some of the Plaintiffs, do not subscribe to the specific state-selected version set forth in S.B. 10 and/or believe that the imposition of this scripture outside of the context of their faith, as mandated by S.B. 10, conflicts with core religious tenets. *See infra* ¶¶ 116–122; 128–136; 152–159.

75.     Under the Act, all of these students will be forcibly subjected to the state's official version of the Ten Commandments for nearly every hour that they are in school.

---

[2]     *See        2024-2025       Student      Enrollment*,    Tex.    Educ.    Agency, https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_program=adhoc.addispatch.sas &major=st&minor=e&charsln=120&linespg=60&loop=1&countykey=&oldnew=new&_debug= 0&endyear=25&selsumm=ss&key=TYPE+HERE&grouping=e+&format=W (last visited Sept. 22, 2025); Tex. Pub. Sch. Explorer, Tex. Tribune (Apr. 2025), https://schools.texastribune.org.

76.    Texas public schools must operate for at least 75,600 minutes (an equivalent of 1,260 hours) each school year, "including time allocated for instruction, intermissions, and recesses for students." Tex. Educ. Code § 25.081(a). Thus, for students entering the Texas public-school system in kindergarten, S.B. 10 will subject them to the state's preferred religious dogma for up to 16,380 hours across thirteen academic years.

77.    In addition, each of the Defendant School Districts holds various inter-school events and activities throughout the school year during which children, including many of the minor-child Plaintiffs, visit a district school other than their own.

78.    As alleged above, the Act requires that public schools display the Ten Commandments in "a conspicuous place" in every classroom—with no exceptions. The poster or framed copy may include "only the text of the Ten Commandments as provided" in S.B. 10 and must be at least sixteen inches by twenty inches in size. Further, the text of the Commandments must be printed "in a size and typeface that is legible to a person with average vision from anywhere in the classroom[.]"

79.    These minimum requirements of the Act are designed to, and will, ensure that students cannot avoid S.B. 10's displays and are thus more likely to observe, absorb, accept, follow, and live by the religious directives in the Ten Commandments. For example, Lt. Gov. Dan Patrick touted S.B. 10 by boasting that, "in every classroom in Texas, [students] are going to see the Ten Commandments, and they are going to know about God."[3]

80.    Sen. Phil King, S.B. 10's lead Senate sponsor and author, similarly stated, "[W]e want every kid, [pre-K] through twelve, every day, in every classroom they sit in to look on the

---

[3] *Washington Watch with Tony Perkins*, Tony Perkins, at 11:05–11:10 (May 27, 2025), https://www.tonyperkins.com/get.cfm?i=LR25E20#gsc.tab=0.

wall and read . . . those words [] that God says because we want them to understand how important that those statements of God, those rules of God are that they see them in their classroom every single day of their public education."[4]

81.    And, responding to another lawmaker's suggestion that "the members of the legislature should focus more on trying to follow the Ten Commandments rather than telling others to follow them," Rep. Candy Noble, the lead House sponsor and author of S.B. 10, proclaimed during the legislative debates that "it is incumbent on all of us to follow God's law, and I think that we would be better off if we did."[5] Asked whether "our public schools are missing God's law," she responded, "In some instances, yeah," but went on to praise "some amazing teachers out there that are showing an awful lot of Christian behavior and love and concern to their students."[6]

82.    Other lawmakers have likewise made clear the intended religious impact of S.B. 10. Thanking Rep. Noble for introducing the bill, Rep. Harold Dutton, Jr. announced during the floor debate, "I appreciate her bringing this to us because I think, again, to teach our children to better their behavior and that there is something in all of us that God has placed in each and every one of us. And the only way to get that out is to follow His commands. And His commands, the Ten Commandments set that out. And the best way to teach children is to find a means in which they are willing to learn."[7]

---

[4] Kimberly Watts, *king audio 20250618toddstarnes*, YouTube, at 3:40–4:14 (June 21, 2025), https://www.youtube.com/watch?v=Kbll35APGTs (video directly linked from Sen. King's official website in *Action on Iran; New Laws for Securing Borders, Texas Land, Our Citizens and Elections*, https://www.philking.com/2025/06/23/action-on-iran-new-laws-for-securing-borders-texas-land-our-citizens-and-elections/ (June 23, 2025)).

[5] *S.B. 10 H. Floor Debate*, 2025 Leg., 89th Reg. Sess. 5:06:43–5:06:49 (May 24, 2025), https://house.texas.gov/videos/22257 (statement of Rep. Noble).

[6] *Id.* at 5:07:15–5:07:37 (statement of Rep. Noble).

[7] *Id.* at 5:56:28–5:56:57 (statement of Rep. Dutton).

83.    During a legislative hearing, Sen. Donna Campbell, a primary author of S.B. 10, also emphasized the importance of introducing schoolchildren to scripture: "God tells us in Joshua 1:9 to be strong and courageous. Don't be afraid. Don't be discouraged, because the Lord, thy God is with us throughout our life. There is an afterlife. There is eternal life. And if we don't expose— or introduce is a better word—our children and others to that, when they die, they had one birth, two deaths, because they will know nothing about the afterlife, the eternity with God. But exposing them or introducing them to Ten Commandments [and] prayer, it asks other questions, and they then have a choice in their future. Two births, and one death. And this is what we're doing. Prayer gives us our faith. The Ten Commandments, while they are laws, actually expand our freedoms. That's what we're about."[8]

84.    During the same hearing, Sen. Campbell also chastised a Baptist reverend who testified against a separate bill that would authorize public schools to institute official periods of prayer, warning the minister: "Perhaps the nationally accredited chaplaincy provides you the foundation for your beliefs in your testimony here, but the Baptist doctrine is Christ-centered. Its purpose is not to go around trying to defend this or that. It is to be a disciple and a witness for Christ. That includes the Ten Commandments, that's prayer in schools. It is not a fight for separation between church and state."[9]

85.    Reacting to testimony supporting S.B. 10 and the school-prayer bill, Sen. Tan Parker, another primary author of S.B. 10, revealed: "I'm in shock . . . that only twenty-five percent of our kids today in schools have been in a church. That should make everybody listening

---

[8] *S.B. 10 Hearing Before S. Comm. on Educ. K-16*, 2025 Leg., 89th Reg. Sess. 2:11:53– 2:13:12 (Mar. 4, 2025), https://www.senate.texas.gov/videoplayer.php?vid=21245&lang=en (statement of Sen. Campbell).

[9] *Id.* at 2:47:00–2:47:27 (statement of Sen. Campbell).

absolutely scared to death. I mean, obviously, only the Lord can save us, and we need to engage in prayer. But to realize only twenty-five percent of our kids in schools today have been in a church is absolutely horrific and something we all need to work on to address."[10]

86.     In considering S.B. 10, lawmakers repeatedly rejected proposed amendments that would have required parental consent for the Ten Commandments displays or that would have required the simultaneous display of religious texts and tenets from other faiths. Lawmakers also dismissed concerns that S.B. 10 would spiritually burden non-Christian students. For example, during the Senate discussion of the bill, primary S.B. 10 author Sen. Brent Hagenbuch explained: "Christians have been intimidated and afraid to talk about or express their faith at work and in school in this country. Christians are the majority, pretty clearly. We, with our faith, but more importantly in this context as Texans, the majority needs to look out for the minority, I understand, and be careful not to trample them. *But we've gone too far there* . . . So, I think it's important that we're able to have the freedom to express our faith . . . through the Ten Commandments . . .."[11]

87.     After one legislator pointed to "Muslim students that are being bullied in Texas public schools" and "Jewish students being bullied" as a reason to avoid imposing Christian scripture in classrooms, Rep. Noble doubled down, declaring, "Oh, then we really need the Ten Commandments in there on how to treat others kindly."[12] And after being advised that Texas public "schools also serve students of other faith backgrounds," including "Muslim students, Hindu students, Buddhist students, Sikh students, [and] atheist students"—and asked how it will make "a

---

[10] *Id.* at 2:02:23–2:02:50 (statement of Sen. Parker).

[11] *S.B. 10 S. Debate*, 2025 Leg., 89th Reg. Sess. 25:48–26:36 (Mar. 19, 2025), https://www.senate.texas.gov/videoplayer.php?vid=21416&lang=en (statement of Sen. Hagenbuch) (emphasis added).

[12] *S.B. 10 Hearing Before H. Comm. on Pub. Educ.*, 2025 Leg., 89th Reg. Sess. 6:41:41–6:41:45 (Apr. 29, 2025) https://house.texas.gov/videos/21958 (statement of Rep. Noble).

Hindu student feel to have a poster in every classroom that says, 'Thou shalt not worship any God before me?'"—Noble replied: "I don't know. I haven't asked one. Have you?"[13] She went on to imply that these students are interlopers, stating, "I assume they're Americans now? I think that they would find it interesting to see what was important and foundational to our forefathers that made this nation a place that they wanted to come and live and raise a family and be part of it."[14]

88.    As a result of the displays mandated by S.B. 10, students who do not subscribe to the state's official version of the Ten Commandments or whose faith tenets and values are otherwise contradicted by the displays—including the minor-child Plaintiffs—will be pressured into religious observance, veneration, and adoption of this religious scripture.

89.    As a result of the displays mandated by S.B. 10, students who do not subscribe to the state's official version of the Ten Commandments or whose faith tenets and values are otherwise contradicted by S.B. 10's displays—including the minor-child Plaintiffs—will also be pressured to suppress expression or practice of their own faiths and religious beliefs or nonreligious beliefs in view of their peers, teachers, and other school staff.

**Despite the _Nathan_ Court's Ruling, Defendants Have Posted Unconstitutional Ten Commandments Displays or Intend to Post Such Displays Soon.**

90.    On July 2, 2025, a group of multifaith and nonreligious Texas families filed a lawsuit in the Western District of Texas against Alamo Heights Independent School District, North East Independent School District, Lackland Independent School District, Northside Independent School District, Austin Independent School District, Lake Travis Independent School District, Dripping Springs Independent School District, Houston Independent School District, Fort Bend Independent School District, Cypress Fairbanks Independent School District, and Plano

---

[13] _Id._ at 6:40:31–6:40:44 (statement of Rep. Noble).
[14] _Id._ at 6:40:51–6:41:05. (statement of Rep. Noble).

Independent School District, seeking to enjoin the school districts from complying with S.B. 10. *See* Complaint, No. 5:25-cv-00756 (W.D. Tex. July 2, 2025), ECF No. 1.

91.     On August 20, 2025, Judge Fred Biery of the Western District of Texas entered a preliminary injunction enjoining the school district defendants from posting the Ten Commandments pursuant to S.B. 10.[15] *Nathan*, 2025 WL 2417589, at *29. Denying a motion to dismiss the Complaint, the court held that the plaintiffs satisfied the standing and ripeness requirements of Article III of the U.S. Constitution, *id.* at *13–14, and that the plaintiffs were likely to succeed on the merits of their Establishment Clause and Free Exercise claims, *id.* at *25–28.

92.     Following the *Nathan* court's ruling, plaintiffs' counsel in *Nathan* sent a letter to every school superintendent in Texas (other than the superintendents of the defendant school districts in *Nathan*) to inform them of the court's ruling. The letter noted that, although the districts may not be technically bound by the court's ruling, they have an independent legal obligation to respect their students' constitutional rights. The letter further informed the superintendents that, "[i]n light of the court's August 20 ruling that S.B. 10 is unconstitutional, any school district that implements S.B. 10 will be violating the First Amendment and could be inviting additional litigation."

---

[15] Following a joint stipulation of dismissal, on August 19, 2025 the court entered an order dismissing Austin Independent School District without prejudice. *See* Order of Dismissal Without Prejudice of Def. Austin Indep. Sch. Dist., No. 25-cv-00756 (W.D. Tex. Aug. 19, 2025), ECF No. 77. The court further ordered that Austin ISD would be subject to and bound by any order or injunction issued by the court enjoining the implementation of S.B. 10, as if it were still a defendant in the matter, that Austin ISD had disclaimed any intent to comply with S.B. 10 during the pendency of the litigation, and that Austin ISD would take all necessary actions to ensure each school within the district abides by the court's order and any final result in the case. *See id.* at 2.

93.     Despite the warning by the *Nathan* plaintiffs' counsel, and the court's ruling in *Nathan*, the Defendants have already displayed—or confirmed their intent to soon display—Ten Commandments posters in their schools.

94.     Defendant Comal Independent School District has accepted donated Ten Commandments posters and announced that the posters would be displayed in the district's classrooms. The announcement stated: "Senate Bill 10 of the 89th Legislative Session requires Texas public schools to display the Ten Commandments in each classroom. In accordance with this law, Comal ISD will begin posting donated copies of the Ten Commandments in classrooms." As promised by Comal ISD, an S.B. 10 display was recently posted in at least one classroom for minor-child Plaintiff E.F., and the posters will soon be displayed in all classrooms for minor-child Plaintiffs E.F., M.F., and E.R., who attend Comal ISD schools. By accepting donations of Ten Commandments posters and directing their display, Comal ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

95.     The Superintendent of Schools for Defendant Georgetown Independent School District, Dr. Devin Padavil, confirmed in a conversation with Plaintiff Amber Rainey that the district already has donors prepared to provide posters that conform to the requirements of S.B. 10. He further confirmed that the district is merely waiting on the posters to arrive and will display the posters in every classroom once the district receives the anticipated donations. Thus, the Ten Commandments will soon be displayed in all classrooms for minor-child Plaintiff K.R., who attends school in Georgetown ISD. By accepting donations of Ten Commandments posters and planning for their display, Georgetown ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

96.     Defendant Conroe Independent School District has accepted donated posters of the Ten Commandments and announced that the posters will be displayed in district schools. Andrew Stewart, executive director of communications for Conroe ISD, issued the following statement: "The district has begun delivering the required Senate Bill 10 posters to campuses and they will be displayed in classrooms by the first class on Sept. 2, since Sept. 1 is a holiday." He further stated, "[w]hile we anticipate that further court action may result in an injunction requiring their removal, Conroe ISD will continue to comply with the law as it stands."[16] The posters are already displayed in some Conroe ISD classrooms, including the classrooms of minor-child Plaintiffs N.H., E.B.W., P.B.W., and A.B.W., and the posters will soon be displayed in all classrooms for all minor-child Plaintiffs who attend Conroe ISD schools. By accepting donations of Ten Commandments posters and directing their display, Conroe ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

97.     Defendant Flour Bluff Independent School District has hung posters of the Ten Commandments in its classrooms, including in minor-child Plaintiff T.L.'s classrooms. By directing the display of the Ten Commandments posters, Flour Bluff ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

98.     Defendant Fort Worth Independent School District recently informed its principals and administrators in a September 12, 2025, communication that "[t]he District has received a

---

[16] Catherine Dominguez, *Conroe ISD to display Ten Commandments at all campuses despite ruling that blocks state law in other districts*, Houston Chronicle (Aug. 28, 2025), https://www.houstonchronicle.com/news/houston-texas/trending/article/conroe-isd-ten-commandments-display-21019933.php; *see also Release: $6,000 Donated for Ten Commandments Posters to Conroe ISD*, Texas Values, https://txvalues.org/release-6000-donated-for-ten-commandments-posters-to-conroe-isd/ (last visited Sept. 22, 2025).

private donation of posters for FWISD campuses" and that "[t]hese posters will be delivered to your campus next week." Thus, the Ten Commandments will soon be posted in all classrooms for minor-child Plaintiffs F.K. and W.K., who attend school in Fort Worth ISD. By accepting donations of Ten Commandments posters and directing their display, Fort Worth ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

99.    Defendant Arlington Independent School District has accepted donated Ten Commandments posters and has indicated that it will hang the displays in its classrooms. Thus, Ten Commandments displays will soon be posted in all classrooms for minor-child Plaintiffs J.L. and L.L., who attend school in Arlington ISD. By accepting donations of Ten Commandments posters and directing their display, Arlington ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

100.    According to an email sent to parents by Shawn Pratt, superintendent of Defendant McKinney Independent School District, most of the district's campuses have received donated Ten Commandments posters, which the district intends to post in its classrooms. As promised, the posters have been hung in many district classrooms, including minor-child Plaintiff C.L.'s classrooms. By accepting donations of Ten Commandments posters and directing their display, McKinney ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

101.    Defendant Frisco Independent School District has installed 4,805 Ten Commandments posters across 77 campuses, purchased by the District for approximately $1,800. Prior to S.B. 10's effective date, a representative for Frisco ISD sent an email to parents, stating:

"The Ten Commandments will be on Frisco ISD classroom walls by the start of school."[17] The email further stated that the Ten Commandments "is the only religious text that will be permitted to be displayed in Frisco ISD classrooms unless otherwise tied to a Texas Essential Knowledge standard appropriate for the student's grade level."[18] As promised, the posters are displayed in Frisco ISD's classrooms, including classrooms for minor-child Plaintiffs D.J. and A.M. By purchasing Ten Commandments posters and directing their display, Frisco ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

102.    Defendant Northwest Independent School District has hung Ten Commandments posters in district classrooms, including minor-child Plaintiff R.O.'s classrooms. By directing the display of the Ten Commandments posters, Northwest ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

103.    Defendant Azle Independent School District has hung Ten Commandments posters in district classrooms, including in minor-child Plaintiff R.D.'s classrooms. By directing the display of the Ten Commandments posters, Azle ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

104.    On information and belief, Defendant Rockwall Independent School District has accepted donated S.B. 10 posters and already displayed them in many district classrooms, and will soon hang them in all classrooms within the district, including minor-child Plaintiff J.R.'s classrooms. Rockwall ISD's Chief Student Services Officer, Dr. Kelvin Stroy, confirmed by email

---

[17] Dylan Duke, *These are some of the major changes coming to North Texas schools this year*, KERA News (July 31, 2025), https://www.keranews.org/education/2025-07-31/these-are-some-of-the-major-changes-coming-to-north-texas-schools-this-year.

[18] *See id.*

to Plaintiff Patricia Ruiz that "Rockwall ISD will comply with Senate Bill 10." By accepting donations of Ten Commandments posters and directing their display, Rockwall ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

105.    Defendant Lovejoy Independent School District has accepted donations of S.B. 10 posters and hung them in district classrooms, including several classrooms for minor-child Plaintiff R.S. Furthermore, in a September 4, 2025, email to parents, Lovejoy ISD stated that additional "[c]opies [of the Ten Commandments] will be displayed in the order that donations are received, beginning with the high school, followed by the other campuses." The email identified the order in which donations will be posted in Lovejoy schools: Lovejoy High School, then Willow Springs Middle School, then Sloan Creek Intermediate School, then Puster Elementary School, and finally, Hart Elementary School. The email additionally explained that "[t]he District is aware of ongoing litigation related to this law and will continue to monitor for any updates or new requirements that may result." Thus, the Ten Commandments will soon be posted in all classrooms for minor-child Plaintiffs R.S. and N.S., who attend Lovejoy ISD schools. By accepting donations of Ten Commandments posters and directing their display, Lovejoy ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

106.    Defendant Mansfield Independent School District confirmed on its official website that it has received donated posters and that staff members will begin installing them. To ensure uniform compliance, the district noted that teachers may not "refuse to have the Ten Commandments posters in their classrooms," and that it "is unable to comply with requests [from

parents] to remove the posters from a student's classroom."[19] Thus, Ten Commandments displays will soon be posted in all classrooms for minor-child Plaintiff E.S., who attends school in Mansfield ISD. By accepting donations of Ten Commandments posters and directing their display, Mansfield ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

107.    Defendant McAllen Independent School District has hung S.B. 10 displays in district classrooms, including in the classrooms for minor-child Plaintiffs E.G. and E.R.G. By directing the display of the Ten Commandments, McAllen ISD has adopted and implemented a policy, practice, and/or custom of displaying the Ten Commandments in its schools.

**Plaintiffs Will Be Harmed by S.B. 10's Scriptural Displays.**

108.    As set forth further below, the religious displays mandated by S.B. 10 will harm the Plaintiffs in a variety of ways. Principal among these harms, the displays will: (1) forcibly subject the minor-child Plaintiffs to religious doctrine and beliefs in a manner that conflicts with their families' religious and nonreligious beliefs and practices; (2) send a marginalizing message to the minor-child Plaintiffs and their families that they do not belong in their own school community because they do not subscribe to the state's preferred religious text; (3) religiously coerce the minor-child Plaintiffs by pressuring them to observe, meditate on, venerate, and follow the state's favored religious text, and by pressuring them to suppress expression of their own religious or nonreligious beliefs and backgrounds at school; and (4) substantially interfere with the religious development of the minor-child Plaintiffs and threaten to undermine the beliefs, practices, and values regarding matters of faith that the parent-Plaintiffs wish to instill in their

---

[19] *Mansfield ISD Statement Regarding Senate Bill 10*, Mansfield Independent School District, https://www.mansfieldisd.org/departments/government-affairs/legislative-sessions/bill-summary (last visited Sept. 22, 2025).

children, thereby usurping the parents' authority to direct their children's religious education and religious or nonreligious upbringing.

*Plaintiff Roxanne Cribbs Ringer and her minor child*

109.    Plaintiff Roxanne Cribbs Ringer is spiritual but is raising E.R. in a secular household that gives E.R. the space and autonomy to develop their own beliefs and views about religion. The family does not regularly observe or adhere to any religious text, practice, or ritual, and Mrs. Cribbs Ringer has not discussed the Bible or the Ten Commandments with E.R.

110.    Mrs. Cribbs Ringer does not subscribe to the religious dictates of the Ten Commandments and objects, on behalf of herself and on behalf of E.R., to the school displays mandated by S.B. 10 because they will promote and forcibly subject E.R. to religious scripture that the family does not believe in and that she does not teach E.R.

111.    The displays mandated by S.B. 10 will substantially interfere with how Mrs. Cribbs Ringer is directing E.R.'s religious and moral development. As E.R.'s parent, Mrs. Cribbs Ringer has chosen not to teach the Ten Commandments to E.R. She does not discuss the idea of a "God" or "Lord." By prominently displaying the Ten Commandments in every classroom, the school environment will impose on E.R. religious and moral directives that are not developmentally appropriate. This will force E.R. to consider religious concepts that E.R. is not yet able to understand. The displays will thus undermine the beliefs, values, and practices pertaining to religious matters that Mrs. Cribbs Ringer seeks to instill in E.R. as part of their secular household. Specifically, the displays will impose on E.R. one set of religious values and beliefs over the family's values, which are not based in religion. Mrs. Cribbs Ringer does not want the government to push any particular religion or religious morality on E.R.

112.    By imposing the Ten Commandments on E.R. for nearly every hour of the school day, the displays required by S.B. 10 will be unavoidable and will send a confusing and harmful message that the Ten Commandments are rules that must be followed and that those who do not follow the Ten Commandments are less worthy and outsiders in the school community. Mrs. Cribbs Ringer teaches E.R. to listen to authority figures at school and to follow the school's rules. Thus, E.R. will believe that it is mandatory to follow the Ten Commandments or risk getting in trouble or being "wrong" and marginalized from peers. As a result, S.B. 10's religious displays will pressure E.R. to observe, venerate, and adopt the state's preferred religious doctrine.

113.    S.B. 10's displays are also likely to lead to peer-on-peer harassment, ostracism, and social isolation of E.R. because the family is not religious. E.R. will be hesitant to express the family's beliefs at school and will feel pressure to express a religious belief in the Ten Commandments in order to fit in with E.R.'s classmates.

114.    Further, Mrs. Cribbs Ringer finds the specific language of the state-mandated Ten Commandments to be objectionable because it introduces topics, such as adultery and coveting "thy neighbor's wife," that are not appropriate for E.R. She believes that these concepts are far too mature for E.R.'s age. She does not want her child's teachers to explain these topics to E.R., especially if introduced in the context of religious doctrine.

115.    For all the reasons above, the displays mandated by S.B. 10 will directly interfere with and substantially burden Mrs. Cribb Ringer's ability to direct E.R.'s education pertaining to religious questions and matters in a manner that emphasizes and instills secular values and a worldview that allows E.R. to form their own beliefs regarding questions of faith.

*Plaintiff John Fuechsel and his minor children*

116.     Plaintiff John Fuechsel is Christian. Although he has chosen to share his faith with his children, he intentionally does not guide them toward any particular belief system or religious practice. As a Christian, he believes that faith is most powerful when individuals come to embrace a religion on their own accord. Thus, he believes that all people, including his children, should have the freedom to develop their own beliefs and views about religion, without pressure from others. To allow his children, E.F. and M.F., the space to develop their own views and beliefs about religion, the family does not regularly observe or adhere to any religious text, practice, or ritual. His children currently identify as Christian, but do not engage in many religious activities and do not attend church.

117.     As a Christian, Mr. Fuechsel believes in some of the passages of the Ten Commandments. However, prior to the enactment of S.B. 10, he had decided against having his children read the Ten Commandments as part of their religious education because the text includes religious directives that he does not want his children to feel bound by. For example, the displays direct, "I AM the LORD thy God" and "Thou shalt have no other gods before me." However, he teaches his children that it is okay if they become nonreligious or want to adhere to a non-Christian religion. While he shares his faith with the children at home and during Christian holidays, instead of proselytizing to them and imposing his religious tenets on them, he focuses primarily on teaching them to be good family members, good friends, and good community members *without* relying on a specific religion or religious text. He welcomes them to explore their religious beliefs or lack thereof. Thus, on behalf of himself and on behalf of his children, Mr. Fuechsel objects to the displays required by S.B. 10 because they will promote, and forcibly subject his children to, religious scripture that they do not believe in and that he does not teach them.

118.    The displays mandated by S.B. 10 will substantially interfere with how Mr. Fuechsel is directing his children's religious and moral development. By imposing the Ten Commandments on his children for nearly every hour of the school day, the displays required by S.B. 10 will be unavoidable and will send a confusing and harmful message that the Ten Commandments are rules that must be followed and that those who do not follow the Ten Commandments are less worthy and outsiders in the school community. Because he teaches his children to listen to the authority figures at school and to follow the school's rules, they will believe that it is mandatory to follow and believe in the Ten Commandments or risk getting in trouble or being "wrong" and marginalized from peers. S.B. 10's religious displays will thus pressure E.F. and M.F. to observe, venerate, and adopt the state's preferred religious doctrine and practice.

119.    The displays will also threaten to undermine the beliefs, values, and practices pertaining to religious matters that Mr. Fuechsel seeks to instill in his children. He believes that his children must be free to accept or reject any particular religion without pressure from him or other authority figures. He teaches them that faith is a deeply personal matter and that they have the right to determine such matters of conscience for themselves. While driven in large part by his own Christian values, Mr. Fuechsel seeks to instill these values in his children without reliance on one religion or a religious text. However, the displays mandated by S.B. 10 will impose on E.F. and M.F. one set of religious values and beliefs that is different from what he is teaching them. Mr. Fuechsel does not want the government to push any particular religion or religious morality on E.F. and M.F.

120.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and social isolation of Mr. Fuechsel's children because they are not as traditionally religious as their peers. Because E.F. and M.F. do not engage in many religious activities, even though they identify

as Christian, they already feel that their faith is not considered "Christian enough" by their peers. The Ten Commandments displays required by S.B. 10 risk bringing more attention to these differences. In order to avoid further marginalization, Mr. Fuechsel's children will feel pressure to conform to and express the religious beliefs in the Ten Commandments, while questioning their family's teachings and suppressing expression of their family's beliefs.

121.    Further, Mr. Fuechsel finds the specific language of the state-mandated Ten Commandments to be objectionable because it introduces topics, such as adultery and coveting "thy neighbor's wife," that are not appropriate for his children. Mr. Fuechsel believes that these concepts are too mature for his children and will not bring moral clarity, but rather confusion. He does not want his children's teachers to explain these topics to them, especially if introduced in the context of religious doctrine.

122.    The ability to guide his children's religious education and to ensure that they are able to arrive at their faith beliefs, if any, on their own accord is a critical aspect of Mr. Fuechsel's religious belief and religious exercise as a Christian. For the reasons discussed above, the displays mandated by S.B. 10 will directly interfere with and substantially burden this religious exercise.

*Plaintiff Amber Rainey and her minor child*

123.    Plaintiff Amber Rainey is an atheist and is raising her child, K.R., in a nonreligious tradition and household that emphasizes developing good moral character without the teachings of organized religion. Ms. Rainey intentionally chooses to give K.R. the independence to develop their own beliefs and views about religion without pushing K.R. to adhere to any religious text, practice, or ritual.

124.    Ms. Rainey and her family do not subscribe to the religious dictates of the Ten Commandments, and Ms. Rainey objects, on behalf of herself and on behalf of K.R., to the school

displays mandated by S.B. 10 because the displays will promote and forcibly subject K.R. to religious scripture that Ms. Rainey does not believe in and that she intentionally does not teach at home. Ms. Rainey does not want the government to push any particular religion or religious morality on her child.

125.    By imposing the Ten Commandments on K.R. for nearly every hour of the school day, the displays required by S.B. 10 will be unavoidable and will send the message to K.R. that the Ten Commandments are rules that K.R. must follow and that those who do not do so are "wrong," less worthy, and outsiders in their own school community. The displays will thus pressure K.R. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

126.    Ms. Rainey further objects to S.B. 10's displays because they are likely to lead to peer-on-peer harassment, ostracism, and proselytization of K.R. because K.R. is not religious. As a high school student, K.R. feels significant pressure to "fit in" and is aware that being identified by peers as an atheist marks them as different from the majority. K.R. is young for their grade; K.R.'s peers are often two or three years older than them, which further marks K.R. as different and makes them more susceptible to peer pressure. As a result of S.B. 10, the displays will increase the likelihood of K.R. being confronted with religious questions and conversations at school and either being pressured to conform or being marginalized for being different because they are nonreligious. The displays will thus further pressure K.R. to suppress expression of the family's nonreligious background and views at school.

127.    The mandated Ten Commandments displays also include directives, such as "I AM the LORD thy God," "Thou shalt have no other gods before me," and "Remember the Sabbath day, to keep it holy," that directly conflict with Ms. Rainey's sincerely held beliefs as an atheist, what she teaches her child about these issues, and her desire as a parent to raise K.R. to come to

their own decisions regarding religion. The displays mandated by S.B. 10 thus directly interfere with and substantially burden Ms. Rainey's ability to direct K.R.'s education pertaining to religious questions and matters in a manner that emphasizes nonreligious values and empowers K.R. to reach their own conclusions regarding religion.

*Plaintiff Lenee Bien-Willner and her minor children*

128.    Plaintiff Lenee Bien-Willner is Jewish and, along with her spouse, is raising their children, E.B.W., P.B.W., and A.B.W., in the Jewish tradition. Her family regularly attends synagogue, and her children attend Sunday school and Hebrew school as well. A.B.W. volunteers as a leader at Sunday school, as well as at the synagogue camp that the children attend every year. Ms. Bien-Willner also taught Sunday school for many years.

129.    On behalf of herself and on behalf of her children, Ms. Bien-Willner objects to the school displays mandated by S.B. 10 because the displays promote and forcibly impose on E.B.W., P.B.W., and A.B.W. a specific version of the Ten Commandments to which her family does not subscribe, in a manner that is contrary to Jewish teachings and her family's Jewish faith.

130.    The Ten Commandments are a religious text that contains religious instruction. The version of the Ten Commandments required by S.B. 10, however does not align with the Bien-Willner family's Jewish beliefs and tradition. It is a Christian interpretation of the Commandments that is exclusionary to non-Christians, even to Jews who believe in the Ten Commandments. For example, there is a theologically significant difference in wording between the Torah and S.B. 10's directive that "Thou shalt not kill." In Jewish doctrine, this Commandment centers on the concept of "murder," not killing. This speaks to intent and is a more nuanced understanding of what it means to cause a death that is theologically forbidden.

131.    Ms. Bien-Willner's children are among a small number of Jewish children who attend their schools. By imposing on them a Christian version of the Ten Commandments for nearly every hour of the school day, S.B. 10's religious displays are unavoidable and send the message that this version of the Ten Commandments is authoritative and that students who do not believe in this version are less worthy or outsiders. As a result, Ms. Bien-Willner's children are pressured to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

132.    Unfortunately, Ms. Bien-Willner's children have already faced antisemitism at school. E.B.W. has received unwanted attention from peers for not being Christian. A.B.W. has been pressured by other students to convert, and some students have made Nazi salutes at A.B.W. By conveying to all children that the Christian faith is preferable to non-Christian faiths, Ms. Bien-Willner is concerned that the posters will lead to increased harassment, ostracization, and proselytization of her children for being Jewish and discourage them from expressing their Jewish faith at school.

133.    Further, the displays mandated by S.B. 10 substantially interfere with her children's development of their Jewish faith and threaten to undermine the religious beliefs, values, and practices that Ms. Bien-Willner seeks to instill in them as part of their Jewish household. Judaism emphasizes conversation about religious principles and teaches that followers should not take everything at face value. This is an important part of the family's faith and the religious upbringing of Ms. Bien-Willner's children. She does not teach her children to believe that every story in the Bible is literal, and she believes that religious lessons must be discussed and understood in the context of the entire Jewish tradition. Thus, instruction in the Ten Commandments must occur in a measured, thoughtful way, within the context of their faith community. It violates the tenets of

the family's faith to take the Ten Commandments out of context in the manner required by S.B. 10—the Commandments must be understood in the context of other Jewish texts and lessons.

134.    S.B. 10's displays also create religious confusion for Ms. Bien-Willner's Jewish children, as some of the Commandments cannot be understood without context or explanation. For example, Ms. Bien-Willner believes that the Commandment to not take the Lord's name in "vain" means that people should not commit evil, such as war, in God's name. But this is often misunderstood. Ms. Bien-Willner is concerned that posting the Ten Commandments in classrooms will encourage teachers to expound on the displayed religious doctrine when there is not a shared understanding of that doctrine. Religious doctrine is personal and specific to each person's faith; it has no place in public school, and it is Ms. Bien-Willner's belief that any religious teachings for her children should be left to her and her husband and their faith community.

135.    Ms. Bien-Willner does not want the government to push any particular religion or religious morality on E.B.W., P.B.W., and A.B.W. Their faith teaches that it is wrong to impose religious beliefs on others and that it is important to be open to and accepting of everyone. Ms. Bien-Willner teaches her children that everybody's faith is special and important, and that this belief is how people can come together. Forcing the Ten Commandments into public-school classrooms contradicts these values.

136.    The responsibility to guide Ms. Bien-Willner's children in the development of their Jewish faith and religious education is an essential aspect of Ms. Bien-Willner's religious exercise and role as a parent. S.B. 10's displays directly interfere with her role as a parent and substantially burden this religious exercise for all the reasons discussed above.

*Plaintiff Jeremy Halland and his minor children*

137.    Plaintiff Jeremy Halland is an atheist and is raising his children, N.H. and S.H., in a nonreligious tradition and household that emphasizes developing good moral character without the teachings of organized religion. He is intentionally choosing to give his children the independence to develop their own beliefs and views about religion without pushing them to adhere to any religious text, practice, or ritual.

138.    Mr. Halland's family does not subscribe to the religious dictates of the Ten Commandments. On behalf of himself and on behalf of his children, Mr. Halland objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject his children to religious scripture that he does not believe in and that he does not teach them.

139.    The displays mandated by S.B. 10 substantially interfere with his children's development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Mr. Halland seeks to instill in them as part of his nonreligious household. Specifically, the displays impose on N.H. and S.H. one set of religious values and beliefs over the family's values, which are not based in religion. Mr. Halland does not want the government to push any particular religion or religious morality on N.H. and S.H.

140.    By imposing the Ten Commandments on N.H. and S.H. for nearly every hour of the school day, the displays required by S.B. 10 are unavoidable and send a confusing message to the children that the Ten Commandments are rules that they must follow and that those who do not do so are "wrong," less worthy, and outsiders in their own school community. The displays thus pressure N.H. and S.H. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

141.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and proselytization of Mr. Halland's children because they are not religious. N.H. and S.H. do not flaunt their lack of religious belief while at school because they do not wish to be identified as being different from the majority of their classmates. As a result of S.B. 10, the displays will increase the likelihood of N.H. and S.H. being confronted with religious questions and conversations at school and being marginalized because they are nonreligious.

142.    Mr. Halland also finds much of the specific language in the Ten Commandments mandated by S.B. 10 to be objectionable. It includes topics that Mr. Halland does not wish to be explained to N.H. and S.H. by their teachers, should his children or other students ask about them. Instead of bringing clarity to them about issues of morality, it will only confuse them. For example, the displays required under S.B. 10 reference adultery and coveting "thy neighbor's wife." Mr. Halland does not believe that these are topics that are appropriate to discuss in the classroom, and he does not want his children's teachers explaining these topics to them, especially if introduced in the context of religious doctrine.

143.    The mandated Ten Commandments displays also include directives, such as "I AM the LORD thy God," "Thou shalt have no other gods before me," and "Remember the Sabbath day, to keep it holy," that directly conflict with Mr. Halland's sincerely held beliefs as an atheist, what he teaches his children about these issues, and his desire as a parent to raise his children without belief in any god. The displays mandated by S.B. 10 thus directly interfere with and substantially burden his ability to direct N.H's and S.H.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Kimberly Inmon and her minor child*

144.    Plaintiff Kimberly Inmon is Baha'i and is raising her child, T.L., in a nonreligious tradition that gives T.L. the space and autonomy to develop T.L.'s own beliefs and views about religion, without pressure from any authority figure.

145.    As a member of the Baha'i faith, Ms. Inmon recognizes the Ten Commandments as a religious text but does not believe them to be the ultimate source of truth or morality. Instead, Baha'i adherents like Ms. Inmon venerate the Twelve Principles, which override any other contradictory religious texts, including parts of the Ten Commandments.

146.    Even before she adopted the Baha'i faith, Ms. Inmon prioritized raising T.L. in a nonreligious tradition with room to explore T.L.'s own views of religion. But this parenting practice also aligns with her beliefs in the Twelve Principles, which stress the importance of self-investigation and independent religious exploration, without undue external pressure. Thus, T.L. does not currently observe or adhere to any religious text, practice, or ritual.

147.    The displays mandated by S.B. 10 substantially interfere with T.L.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Inmon seeks to instill in T.L. as part of T.L.'s nonreligious upbringing. Specifically, the displays impose on T.L. one set of religious values and beliefs as authoritative and exclusively true. This not only violates Ms. Inmon's Baha'i beliefs that all major world religions are true and valid, but it also goes against her parental prerogative of not forcing any particular religious beliefs on T.L. and of teaching T.L. that, as a matter of conscience, the decision to believe in any particular religion, or no religion at all, is fully within T.L.'s purview.

148.    By imposing the Ten Commandments on T.L. for nearly every hour of the school day, the displays required by S.B. 10 are unavoidable and send a harmful message to T.L. that T.L.

is an outsider and unwelcome in T.L.'s own school because T.L. is not being raised in a religious tradition, or being taught to venerate the Ten Commandments, and because Ms. Inmon follows a different faith. Ms. Inmon believes the displays thus pressure T.L. to pretend to, or to actually, observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

149.    Ms. Inmon believes the displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of her child because T.L. is not religious and because Ms. Inmon adheres to a minority religion that does not obey the Ten Commandments. T.L. has already experienced instances of proselytization from peers and has felt pressure to fit in with the school's majority-Christian social climate. Ms. Inmon believes that displaying the Ten Commandments in all of T.L.'s classrooms will exacerbate these issues, lead to higher risks of conflict and confrontation between T.L. and T.L's peers, and make T.L. feel distressed about the ostracization of T.L. and T.L.'s peers who do not venerate the Ten Commandments. This also violates Ms. Inmon's Baha'i faith, which forbids religious prejudice and proselytization. She thus believes that the displays also increase the pressure on T.L. to suppress expression of T.L.'s nonreligious background and views at school as well as to hide or suppress discussion of Ms. Inmon's minority-faith background.

150.    Further, it is an important part of Ms. Inmon's Baha'i faith and parenting philosophy that T.L. be raised to respect, and be open to exploring, all religions. She fears that, due to the harms that S.B. 10's displays are causing T.L. and T.L.'s classmates, T.L. will develop a negative view of Christianity and be deterred from exploring it.

151.    Ms. Inmon also finds the specific language of the state-mandated Ten Commandments to be objectionable. The text accepts or even validates concepts like slavery—a message that Ms. Inmon does not want T.L. to receive through the force of the school's authority.

She also objects to the passage: "I am the Lord thy God. Thou shalt have no other gods before me." This is in direct opposition to her Baha'i religious beliefs, which emphasize that all major world religions are true and valid. Her faith also emphasizes the oneness of God and the unity of all religions, but this passage, contrary to her beliefs, draws lines and differentiations between different religions. It also interferes with and substantially burdens her decision, driven by her Baha'i faith, to raise T.L. without a religious tradition and to instead allow T.L. to come to independent decisions about religious practice, free from pressure by Ms. Inmon, school officials, or any authority figure.

*Plaintiffs Reverend Kristin Klade, John Klade, and their minor children*

152.    Plaintiff Reverend Kristin Klade and John Klade are Lutheran and are raising their minor children, F.K. and W.K., in the Lutheran faith. Rev. Klade is a pastor at a local church and a hospice chaplain. F.K.'s and W.K.'s religious education has occurred primarily through the Klades, and through their church and faith community. F.K. and W.K. attend church and Sunday school weekly and participate in community-service events with their church.

153.    On behalf of themselves and on behalf of their minor children, the Klades object to the school displays mandated by S.B. 10 because the displays will promote and forcibly subject their children to religious classroom displays in a manner that violates their family's religious beliefs and practices; usurps the Klades' parental role in directing their children's religious education, religious values, and religious upbringing; sends an improper message to their children that Christianity is superior to other religions; and confuses their children about their faith.

154.    As a pastor, Rev. Klade believes that matters of theology must be taught within the faith community and at home, not in public school. This is especially important when it comes to

religious education for youth because it ensures that their children's religious education, values, and upbringing are aligned with the teachings of their faith tradition.

155.    While the Klades follow the Ten Commandments personally, the version required by S.B. 10 does not align with the Lutheran values that they are teaching their children. The text in the state's approved version of the Ten Commandments is antiquated, and language such as "manservant" and "maidservant" is patriarchal and treats some people as property, which conflicts with the Klades' Lutheran beliefs to love your neighbor as yourself.

156.    Similarly, because school is an institution of authority, posting the King James version of the Ten Commandments in every classroom sends a message to F.K. and W.K. that Christianity is dominant and superior to other faiths, and in turn, that F.K. and W.K., as Christians, are better than their non-Christian peers. This further undermines and conflicts with the Klades' religious teachings and values, which emphasize equality and inclusiveness.

157.    Because the S.B. 10 displays will be unavoidable and are presented not only as rules, but as rules from God, the Ten Commandments carry an implied punitive element: if you break a rule, you have sinned. One of the Klade's children is an ardent rule follower and may think they are sinning if they do not follow the Commandments as they may come to understand them in school, out of context and not consistent with the Klades' Lutheran faith. But that is not how Rev. Klade interprets or teaches the Ten Commandments to F.K. and W.K. or her congregation. Rev. Klade teaches the Ten Commandments through the lens of the gospel—their faith's interpretation and understanding of the Ten Commandments is not about a set of rules that one must follow to be loved by God. Rev. Klade teaches F.K. and W.K., along with others in their faith community, to love your neighbor as yourself, and their faith tradition's interpretation of the Ten Commandments occurs through that lens. Thus, by imposing the S.B. 10 version of the Ten

Commandments on F.K. and W.K., the Klades' children will be pressured to observe, meditate on, venerate, and adopt the state's preferred religious doctrine—which is different from the doctrine that the Klades teach their children.

158.    S.B. 10's displays will also substantially interfere with F.K. and W.K.'s religious development and threaten to undermine the religious beliefs, values, and practices the Klades seek to instill in their children. For example, the Klades' Lutheran faith teaches that they should respect other people's beliefs and nonbelief, engage in interfaith dialogue, and respect their neighbors. By mandating that the King James version of the Ten Commandments be displayed in all public-school classrooms, the state is elevating one religion over other belief or nonbelief systems and forcing the Ten Commandments on public-school children who may not share the same beliefs. This forced imposition of religious scripture on public-school children is completely contrary to the Lutheran values that the Klades are instilling in F.K. and W.K. and undermines what they are teaching them about respecting all people.

159.    The responsibility to guide the F.K. and W.K. in the development of their Christian faith and religious education is an essential aspect of the Klades' religious exercise as Christians, parents, and Rev. Kristin's role as a pastor. For the reasons discussed above, S.B. 10's displays will directly interfere with and substantially burden the Klades' religious exercise.

### *Plaintiff Dr. Whitney Lawrence and her minor children*

160.    Plaintiff Dr. Whitney Lawrence is agnostic and is raising her children, J.L. and L.L., in a secular household that gives them the space and autonomy to develop their own beliefs and views about religion. The family does not regularly observe or adhere to any religious text, practice, or ritual. As part of the children's upbringing, the family has intentionally explored a variety of cultural and religious celebrations to teach the children how different cultures choose to

celebrate holidays and traditions. These experiences are presented as opportunities to foster openness and curiosity, not to guide the children toward any particular belief system.

161.     Dr. Lawrence does not subscribe to the religious dictates of the Ten Commandments and, on behalf of herself and her children, objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly subject her children to religious scripture that the family does not believe in and that Dr. Lawrence does not teach them.

162.     The displays mandated by S.B. 10 will substantially interfere with J.L. and L.L.'s development when it comes to religious questions and matters. By prominently displaying the Ten Commandments in every classroom, the school environment will impose on Dr. Lawrence's children complex theological ideas and religious moral directives that are not developmentally appropriate. This will force J.L. and L.L. to consider and make judgments about religious concepts that they are not yet able to fully comprehend or critically evaluate. The displays will thus threaten to undermine the beliefs, values, and practices pertaining to religious matters that Dr. Lawrence seeks to instill in her children as part of their secular household. Specifically, the displays will impose on J.L. and L.L. one set of religious values and beliefs over their family's values, which are not based in religion. Dr. Lawrence does not want the government to push any particular religion or religious morality on J.L. and L.L.

163.     By imposing the Ten Commandments on J.L. and L.L. for nearly every hour of the school day, the displays required by S.B. 10 will be unavoidable and will send a confusing and harmful message that the Ten Commandments are rules that must be followed and that those who do not follow the Ten Commandments are less worthy and outsiders in the school community.

164.     One of Dr. Lawrence's children is a rule follower who will feel bound to follow the Ten Commandments or risk getting in trouble or being "wrong" and marginalized from peers. Her

other child has already experienced exclusionary dynamics at school because their family does not attend church. S.B. 10's displays will further emphasize this difference. As a result of these factors, J.L. and L.L. will be pressured to observe, venerate, and adopt the state's preferred religious doctrine and are likely to become resentful toward religion, discouraging them from fully exploring various faiths for themselves.

165.     The displays are also likely to lead to peer-on-peer harassment, ostracism, and social isolation of J.L. and L.L. because they are not religious, pressuring them either to suppress expression of their family's secular background and views at school or to feel compelled to speak out and initiate discussions about the Ten Commandments. Conversations about the Ten Commandments will shift the classroom environment away from learning and toward religious debate and further risk marginalization.

166.     Further, Dr. Lawrence finds the specific language of the state-mandated Ten Commandments to be objectionable because it introduces topics, such as adultery and coveting "thy neighbor's wife," that are not developmentally appropriate for her children. Dr. Lawrence believes that these concepts are far too mature for her children at their ages and will not bring moral clarity, but rather confusion. Dr. Lawrence does not want her children's teachers to explain these topics to them, especially if introduced in the context of religious doctrine.

167.     For the reasons above, the displays mandated by S.B. 10 will directly interfere with and substantially burden Dr. Lawrence's ability to direct her children's education pertaining to religious questions and matters in a manner that emphasizes nonreligious values and empowers them to reach their own conclusions regarding religion.

*Plaintiff Michelle Lewis and her minor child*

168.    Plaintiff Michelle Lewis is an atheist. Ms. Lewis and her husband are raising their child, C.L. in a nonreligious tradition and household that gives C.L. the space and autonomy to learn about all kinds of faith traditions and develop C.L.'s own beliefs and views about religion. Although they may discuss different types of religion from time to time if C.L. has questions, the family does not observe or adhere to any religious text, practice, or ritual.

169.    Ms. Lewis's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and on behalf of her child, she objects to the school displays mandated by S.B. 10 because the displays promote and forcibly subject her child to religious scripture that the family does not believe in and that Ms. Lewis does not teach C.L.

170.    The displays mandated by S.B. 10 substantially interfere with C.L.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Lewis seeks to instill in C.L. as part of their nonreligious household. Specifically, the displays impose on C.L. one set of religious values and beliefs over their family's values, which are not based in religion. Ms. Lewis does not want the government to push any particular religion or religious morality on C.L.

171.    By imposing the Ten Commandments on C.L. for nearly every hour of the school day, the displays required by S.B. 10 are unavoidable and send a confusing message to C.L. Because the displays are imposed in every classroom, they convey that this religious scripture is authoritative and that the Ten Commandments are rules that C.L. must follow, including the Commandments about worshipping only one God, keeping the Sabbath, and avoiding idols, among other religious tenets.

172.    By conveying that the Commandments are authoritative rules to be followed, the displays will pressure C.L. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine, and to suppress expression of the family's nonreligious background and views at school, to avoid feeling like an outsider at school and to avoid being viewed as a rule-breaker.

173.    Further, Ms. Lewis finds the specific language in the state-mandated Ten Commandments to be objectionable. It includes topics, such as adultery and coveting "thy neighbor's wife," that she does not wish to be explained to C.L. by C.L.'s teachers, should C.L. or other students ask about them. The displays also use terms such as "manservant" and "maidservant," effectively treating some people as property. This is completely contrary to the values Ms. Lewis tries to instill in her child, which emphasize treating all people with dignity and respect.

174.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Lewis's ability to direct C.L.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

### *Plaintiff Nichole Manning and her minor children*

175.    Plaintiff Nichole Manning is an atheist and is raising her children, D.J. and A.M., in a nonreligious tradition and household that gives them the space and autonomy to develop their own beliefs and views about religion. Although the family may discuss different types of religion from time to time if D.J. and A.M. have questions, they do not observe or adhere to any religious text, practice, or ritual.

176.    Ms. Manning's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and her children, she objects to the school displays

mandated by S.B. 10 because the displays promote and forcibly subject her children to religious scripture that the family does not believe in and that Ms. Manning does not teach D.J. and A.M.

177.    The displays mandated by S.B. 10 substantially interfere with her children's development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Manning seeks to instill in them as part of their nonreligious household. Specifically, the displays impose on D.J. and A.M. one set of religious values and beliefs over their family's values, which are not based in religion. Ms. Manning does not want the government to push any particular religion or religious morality on D.J. and A.M.

178.    By imposing the Ten Commandments on D.J. and A.M. for nearly every hour of the school day, the displays required by S.B. 10 are unavoidable and send a confusing message to them that the Ten Commandments are rules that they must follow and that those who do not do so are "wrong," less worthy, and outsiders in the school community. The displays thus pressure D.J. and A.M. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

179.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of Ms. Manning's children because they are not religious. A.M. has already experienced being proselytized to and excluded by classmates because A.M. is not religious. Displaying the Ten Commandments in all of A.M.'s classrooms will exacerbate these issues. As a result, the displays also increase the pressure on A.M. and D.J. to suppress expression of the family's nonreligious background and views at school.

180.    Further, Ms. Manning finds the specific language of the state-mandated Ten Commandments in S.B. 10 to be objectionable. It includes topics that she does not wish to be explained to D.J. and A.M. by their teachers, should her children or other students ask about them.

48

Instead of bringing clarity to them about issues of morality, it will only confuse them. For example, the displays required under S.B. 10 reference adultery and coveting "thy neighbor's wife." Ms. Manning does not believe that these are topics that are appropriate to discuss in the classroom, and she does not want her children's teachers explaining these topics to them, especially if introduced in the context of religious doctrine.

181.    Finally, for the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Manning's ability to direct D.J.'s and A.M.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

### *Plaintiff Michael Olson and his minor child*

182.    Plaintiff Michael Olson is an atheist and is raising R.O. in a nonreligious tradition and household that gives R.O. the freedom to explore their own religious path. The family does not observe or adhere to any religious text, practice, or ritual.

183.    Mr. Olson does not subscribe to the religious dictates of the Ten Commandments. On behalf of himself and R.O., he objects to the school displays mandated by S.B. 10 because they promote and forcibly subject R.O. to religious scripture that the family does not believe in and that the family does not teach R.O.

184.    The displays mandated by S.B. 10 substantially interfere with R.O.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices pertaining to religious matters that Mr. Olson seeks to instill in R.O. as part of their nonreligious household. Specifically, the displays impose on R.O. a set of religious values and beliefs that the family does not subscribe to, in place of the family's beliefs, which are not based in religion. Mr. Olson wants his child to be free to explore various religions or nonreligious belief

systems without pressure, especially from the government, to conform to any particular religion. He does not want the government to push any religion or religious morality on R.O.

185.    By imposing the Ten Commandments on R.O. for nearly every hour of the school day, the displays required by S.B. 10 are unavoidable and send a confusing message to R.O. that the Ten Commandments are rules that R.O. must follow and that those who do not do so are "wrong," less worthy, and outsiders in the school community. Mr. Olson is concerned that R.O. will view the displayed Ten Commandments as authoritative commands of the government. The displays thus pressure R.O. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine as rules R.O. must follow.

186.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and additional proselytization of R.O. because the family is not religious. Mr. Olson worries that, as a result of the Ten Commandments in R.O.'s school, R.O. will be ostracized because of the family's lack of religious beliefs. As a result, the displays also increase the pressure on R.O. to suppress expression of the family's nonreligious background and views at school, and to express beliefs that are contrary to the family's beliefs and that instead conform to the religious beliefs imposed via S.B. 10's displays.

187.    Further, Mr. Olson finds the specific language of the state-mandated Ten Commandments to be objectionable. It includes topics, such as "adultery" and coveting "manservants and maidservants," that he does not wish to be explained to R.O. by teachers, should his child or other students ask about them. Instead of bringing clarity to R.O. about issues of morality, it will only cause confusion. Mr. Olson does not believe that these topics are appropriate to discuss in the classroom, and he does not want his child's teachers explaining them to R.O., especially if introduced in the context of religious doctrine.

188.    For the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Mr. Olson's ability to direct R.O.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

### *Plaintiff Shannon Olson and her minor child*

189.    Plaintiff Shannon Olson is agnostic and is raising her child, R.D., in a nonreligious tradition and household that gives R.D. the space and autonomy to develop R.D.'s own beliefs and views about religion. Although the family may discuss different types of religion from time to time if R.D. has questions, and R.D. is allowed to attend religious services with friends, the family does not observe or adhere to any religious text, practice, or ritual as a family.

190.    The displays mandated by S.B. 10 substantially interfere with R.D.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Olson seeks to instill in R.D. as part of their nonreligious household. Specifically, the displays impose on R.D. one set of religious values and beliefs in contravention of their family's values, which are not based in religion. Ms. Olson does not want the government to push any particular religion or religious morality on R.D.

191.    By imposing the Ten Commandments on R.D. for nearly every hour of the school day, the displays required by S.B. 10 are unavoidable and send a harmful message to R.D. that the school and other government authorities prefer one religion over all others, including nonreligion, and those that do not align with that specific religious tradition are wrong or immoral. It also sends the coercive message that the displays set forth authoritative rules that must be followed for R.D. to be considered a "good person." The displays thus pressure R.D. to pretend to, or to actually, observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

192.    The displays are also likely to lead to peer-on-peer bullying, shaming, and ostracization of R.D. because R.D. and Ms. Olson's family are not religious. R.D. already feels othered and outnumbered when R.D.'s predominantly Christian classmates discuss their religion. Because of this peer pressure, R.D. does not disclose R.D.'s nonreligious background to classmates. R.D. also feels distress about the ostracization of R.D. and R.D.'s peers who do not subscribe to the Ten Commandments. Displaying the Ten Commandments in all of R.D.'s classrooms exacerbates these issues and will further distract R.D. from R.D.'s studies. As a result, the displays also increase the pressure on R.D. to suppress expression of the family's nonreligious background and views at school.

193.    Further, as an agnostic, Ms. Olson believes it is important that R.D. be raised to be open to exploring all religions. Ms. Olson fears that, due to the harms that S.B. 10's displays are causing R.D. and R.D.'s classmates, R.D. will develop a negative view of Christianity and be deterred from exploring it.

194.    Ms. Olson also finds the specific language of the state-mandated Ten Commandments to be objectionable. For example, the displays required under S.B. 10 reference adultery. Ms. Olson does not believe that this topic is appropriate to discuss in the classroom, and she does not want her child's teachers explaining "adultery" to R.D. in the context of religious doctrine.

195.    For these reasons, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Olson's ability to direct R.D.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Patricia Ruiz and her minor child*

196.    Plaintiff Patricia Ruiz is nonreligious and is raising her minor child, J.R., in a nonreligious tradition and household that emphasizes developing good moral character without dependence on organized religion or indoctrination. She is intentionally choosing to give J.R. the independence to develop their own beliefs and views about religion without pushing J.R. to adhere to any religious text, practice, or ritual.

197.    Ms. Ruiz's family does not subscribe to the religious dictates of the Ten Commandments. On behalf of herself and her child, Ms. Ruiz objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly subject her child to religious scripture that she does not believe in and that she intentionally does not teach at home.

198.    The displays mandated by S.B. 10 will substantially interfere with J.R.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Ruiz seeks to instill in J.R. as part of their nonreligious household. Specifically, the displays will impose on J.R. one set of religious values and beliefs over the family's values, which are not based in religion. Ms. Ruiz is intentionally raising J.R. without subjecting them to proselytization, and she does not want the government to push any particular religion or religious morality on her child.

199.    By imposing the Ten Commandments on J.R. for nearly every hour of the school day, the displays required by S.B. 10 will be unavoidable and send the message to J.R. that the Ten Commandments are rules that must be followed and that those who do not do so are "wrong," less worthy, and outsiders in their own school community. The displays will thus pressure J.R. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

200.    The displays are also likely to lead to peer-on-peer harassment, ostracism, and proselytization of J.R. because J.R. is not religious. J.R. feels significant pressure to "fit in" at school and is quite susceptible to peer pressure. As a result of S.B. 10, the displays will increase the likelihood of J.R. being confronted with religious questions and conversations at school and either being pressured to conform or being marginalized for being different because the family is nonreligious.

201.    Ms. Ruiz also objects to much of the specific language in the Ten Commandments mandated by S.B. 10. Much of the content within the Ten Commandments is inappropriate for elementary-school children. Subjects such as "commit[ing] adultery" and "covet[ing] thy neighbor's wife" are not age-appropriate, and Ms. Ruiz does not want her child's teachers explaining this subject matter to J.R. in response to J.R.'s questions.

202.    The mandated Ten Commandments displays also include directives, such as "I AM the LORD thy God," "Thou shalt have no other gods before me," and "Remember the Sabbath day, to keep it holy," that directly conflict with Ms. Ruiz's sincerely held beliefs as a person who has chosen to leave organized religion. Ms. Ruiz is intentionally and mindfully raising her child in a nonreligious household, without religious proselytizing, so that J.R. may come to their own decisions regarding religion. The displays mandated by S.B. 10 will thus directly interfere with and substantially burden her ability to direct J.R.'s education pertaining to religious questions and matters in a manner that emphasizes her nonreligious values.

### *Plaintiffs Daniel and Sinjita Sullivan and their minor children*

203.    Plaintiff Daniel Sullivan was raised Catholic, but no longer participates in organized religion. Plaintiff Sinjita Sullivan is Hindu. Their minor children, R.S. and N.S., identify as nonreligious. While the Sullivans discuss various faiths with their children and the children have

attended, from time to time, various religious events and activities with Catholic and Hindu family members, the Sullivans believe that it is vital to give their children the space and autonomy to develop their own beliefs and views about religion.

204.    The family does not subscribe to the religious dictates of the Ten Commandments, such as "I AM the LORD thy God," "Thou shalt have no other gods before me," "Thou shalt not make to thyself any graven images," "Thou shalt not take the Name of the Lord thy God in vain," and "Remember the Sabbath day, to keep it holy." The Sullivans object, on behalf of themselves and their children, to the unavoidable school displays mandated by S.B. 10 because the displays will promote and forcibly subject the children to religious scripture that the family does not believe in and that the Sullivans do not teach them.

205.    S.B. 10's displays will substantially interfere with the Sullivan children's development when it comes to religious questions and matters because the displays are set to impose on R.S. and N.S religious values and beliefs over the family's values, which are not based in a particular religion. By imposing the Ten Commandments on R.S. and N.S. in their classrooms, the displays will send the message that the Ten Commandments are rules that they must follow and that those who do not do so are "wrong" and less worthy. The displays will thus pressure R.S. and N.S. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine to avoid such judgment and isolation.

206.    S.B. 10's displays also threaten to undermine the beliefs, values, and practices pertaining to religious matters that the Sullivans seek to instill in R.S. and N.S. Because of the family's interfaith background, they teach their children to embrace religious inclusivity and equality. They do not believe that one faith is superior to another or that anyone must embrace particular religious tenets in order to be a good person. However, by conveying to R.S. and N.S.

that those who believe in the Ten Commandments are favored by state and school officials and that those who do not believe in the Ten Commandments are less worthy, S.B. 10's displays send the opposite message. This message is particularly pernicious for the Sullivan family because the Ten Commandments include religious directives that contradict Ms. Sullivan's Hindu beliefs, and the displays thus belittle the children's mother and their Hindu heritage and suggest that Christianity is the one true religion. As a result, the displays will also increase the pressure on R.S. and N.S. to hide or suppress discussion of their mother's Hindu faith, their Hindu heritage, and their own nonreligious background and views at school.

207.    For all of the reasons discussed above, the displays mandated by S.B. 10 directly interfere with and substantially burden the Sullivans' ability to direct their children's education pertaining to religious questions and matters in a manner that comports with the family's interfaith background and gives their children the autonomy to determine for themselves, without pressure from authority figures, which faith, if any, they ultimately follow.

### *Plaintiff Marneigh Urban and her minor child*

208.    Plaintiff Marneigh Urban is nonreligious and is raising her child, E.S., in a nonreligious tradition and household that gives E.S. the space and autonomy to develop E.S.'s own beliefs and views about religion. Although they may discuss different types of religion from time to time if E.S. has questions, the family does not observe or adhere to any religious text, practice, or ritual.

209.    Ms. Urban's family does not subscribe to the religious dictates of the Ten Commandments. Therefore, on behalf of herself and on behalf of her child, Ms. Urban objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly subject

her child to religious scripture that the family does not believe in and that Ms. Urban does not teach E.S.

210.    The displays mandated by S.B. 10 will substantially interfere with E.S.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Urban seeks to instill in E.S. as part of the family's nonreligious household. Specifically, the displays will impose on E.S. one set of religious values and beliefs over their family's values, which are not based in religion. Ms. Urban does not want the government to push any particular religion or religious morality on E.S.

211.    By imposing the Ten Commandments on E.S. for nearly every hour of the school day, the displays required by S.B. 10 will be unavoidable and will pressure E.S. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine. Specifically, the displays will convey to Ms. Urban's child that the Ten Commandments are rules that E.S. must follow and that those who do not will get in trouble—especially because E.S. has previously been reprimanded by a teacher for saying "Oh my God."

212.    Because S.B. 10's displays elevate Christianity over all religions and nonbelief, they will also make E.S. feel like an outsider in our school community. This will pressure E.S. to suppress expression of their family's nonreligious background and views at school to avoid further isolation from peers.

213.    For the reasons above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Urban's ability to direct E.S.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Plaintiff Maribel Villarreal and her minor children*

214.    Plaintiff Maribel Villarreal is an Atheist and a Humanist and is raising her children, E.G. and E.R.G., in a nonreligious tradition. As a Humanist, Ms. Villarreal values human agency and independence, believes that religion is not a precondition of morality, and believes that humans are the true source of morality and empathy. Although her husband is a Christian, they are raising their children in a nonreligious tradition because they both strongly believe in (and, as a veteran, her husband fought for) the right of every person to have the space and autonomy to develop their own beliefs and views about religion, which also aligns with Ms. Villarreal's personal Humanist beliefs. She allows her children to independently explore religious and philosophical beliefs, and the family does not observe or adhere to any religious text, practice, or ritual.

215.    The displays mandated by S.B. 10 substantially interfere with E.G. and E.R.G.'s development when it comes to religious questions and matters and threaten to undermine the beliefs, values, and practices pertaining to religious matters that Ms. Villarreal seeks to instill in her children as part of their nonreligious household and her personal Humanist beliefs. Specifically, the displays impose on E.G. and E.R.G. a set of religious values and beliefs that conflict with the nonreligious upbringing Ms. Villarreal seeks to instill in her children. Additionally, her Humanist belief is that morality can, and does, exist independently from religion, and she does not want the government to impose religion or religious morality on her children or interfere with their independent religious exploration.

216.    By imposing the Ten Commandments on her children for nearly every hour of the school day, the displays required by S.B. 10 are unavoidable and send a harmful message to Ms. Villareal's children that they are outsiders, different, and "wrong" because they are being raised

in a nonreligious tradition. The displays thus pressure E.G. and E.R.G. to pretend to, or to actually, observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

217.     The displays are also likely to lead to peer pressure, stigmatization, and harassment of Ms. Villareal's children because the children are not religious. As a result, the displays also increase the pressure on E.G. and E.R.G. to suppress expression of their nonreligious upbringing and their mother's Humanist beliefs at school.

218.     Further, Ms. Villarreal has unique fears about how the displays affect E.G., her elementary schooler. E.G. is autistic, which causes E.G.'s thinking to be very literal and categorical and which causes E.G. to already feel stigmatized among E.G.'s classmates. S.B. 10's displays have caused E.G. much distress. E.G. came home from school after reading the posters and asked Ms. Villarreal "who is the Lord?" When she explained to E.G. the religious origins of the Ten Commandments and the God referenced by them, E.G. immediately expressed anxiety about not fitting into this religious tradition and being further excluded by E.G.'s peers. Ms. Villarreal also fears that E.G.'s information-processing style will lead E.G. to interpret the Ten Commandments as unbreakable rules and literal truths that E.G. must follow, in contravention to the moral and nonreligious upbringing she is providing E.G. at home.

219.     As for E.R.G., Ms. Villarreal believes the displays will further contribute to the societal pressure to "fit in" at school and are likely to cause E.R.G. to suppress E.R.G.'s own nonreligious background. E.R.G. already feels peer pressure to conform E.R.G.'s thoughts and opinions to fit in with the school community's predominant religious and moral values, which differ from the family's values. Ms. Villarreal believes that S.B. 10's displays will only exacerbate that issue and make E.R.G. feel more targeted and excluded. Additionally, E.R.G. is distressed by the harm S.B. 10's displays are causing E.R.G.'s other classmates who also do not subscribe to the

Ten Commandments. E.R.G. and Ms. Villarreal feel that the displays do not benefit E.R.G.'s education, school atmosphere, or school safety. Instead, they believe that the displays are dividing students along religious lines and causing conflict, animosity, and stigmatization at school, which distracts from E.R.G.'s learning and causes E.R.G. anxiety.

220.    Further, Ms. Villarreal finds the specific language of the state-mandated Ten Commandments in S.B. 10 to be objectionable. In particular, she objects to the passage: "I am the Lord thy God. Thou shalt have no other gods before me." This is in direct opposition to her decision, driven by her Humanist beliefs, to raise her children in a nonreligious tradition. It also interferes with her parental choice and personal Humanist beliefs to allow her children the agency to come to independent decisions about religious practice free from pressure by Ms. Villarreal, school officials, or any authority figure.

221.    Ms. Villarreal also objects to references to mature topics, such as "adultery," which are not age appropriate, especially for E.G., and which should not be discussed in E.G.'s classrooms. She already had to explain what adultery meant to E.G. after E.G. read the poster and was very distressed that "thou shalt not commit adultery" meant that E.G. and E.G.'s classmates had to somehow stop themselves from growing up and becoming "adults." Without the displays, Ms. Villarreal would never have broached a topic like adultery so early in E.G.'s life.

222.    For the reasons discussed above, the displays mandated by S.B. 10 directly interfere with and substantially burden Ms. Villareal's ability to direct her children's education pertaining to religious questions, nonreligious beliefs, and morality in a manner that comports with her Humanist beliefs and emphasizes and instills nonreligious values while allowing her children the ability to explore these matters independently, without undue external pressure.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

223.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

224.    The Establishment Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law respecting an establishment of religion."

225.    In *Stone v. Graham*, the Supreme Court struck down a statute similar to S.B. 10, holding that posting the Ten Commandments in public-school classrooms violates the Establishment Clause. 449 U.S. at 41-42. *Stone* remains binding precedent, and S.B. 10 is thus unconstitutional. *See, e.g.*, *Nathan*, 2025 WL 2417589, at *23.

226.    By mandating that a state-sanctioned version of the Ten Commandments be displayed in every public elementary and secondary school classroom in Texas, S.B. 10 impermissibly prefers a set of distinct religious beliefs and dictates and will impose those preferred religious beliefs and dictates on Texas's public-school children, including the minor-child Plaintiffs.

227.    As a result of the Ten Commandments displays mandated by S.B. 10, Texas students—including the minor-child Plaintiffs—will be unconstitutionally coerced into religious observance, meditation on, veneration, and adoption of the state's favored religious scripture, and they will be pressured to suppress expression of their personal religious and nonreligious beliefs and practices, especially in school, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

228.    In addition, by mandating that a Protestant version of the Ten Commandments be displayed in every public elementary and secondary school classroom and prescribing an official religious text for schoolchildren to venerate, S.B. 10 adopts an official position on religious matters, violating the Establishment Clause's prohibition against taking sides in questions over theological doctrine and violating the "clearest command" of the Establishment Clause that "the government may not 'officially prefe[r]' one religious denomination over another." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1591 (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982) (alteration in original)). The Act's mandatory, religiously preferential displays will not further a compelling governmental interest and, even if they did, they are not narrowly tailored to any such interest under the Establishment Clause.

229.    There is no longstanding historical practice or tradition of prominently and permanently displaying any version of the Ten Commandments in public-school classrooms. On the contrary, the Supreme Court unambiguously held in *Stone* that such a practice is proscribed by the Constitution.

230.    By implementing S.B. 10, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Establishment Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and under 42 U.S.C. § 1983.

231.    Plaintiffs have no adequate remedy at law for the denial of their fundamental Establishment Clause rights.

## COUNT II

**VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT
TO THE UNITED STATES CONSTITUTION**

232.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

233.    The Free Exercise Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law . . . prohibiting the free exercise [of religion]."

234.    The displays mandated by S.B. 10 will burden the religious exercise of the minor-child Plaintiffs by pressuring them into observance, meditation on, veneration, and adoption of the state's favored religious scripture—in violation of their own religious or nonreligious beliefs—to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers. The displays will also pressure the minor-child Plaintiffs to suppress or limit expression of their religious or nonreligious backgrounds, beliefs, or practices while in school to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

235.    The displays mandated by S.B. 10. will burden the religious exercise of the parent-Plaintiffs by usurping their authority to direct their children's religious education and religious or nonreligious upbringing.

236.    Under the Free Exercise Clause, when the government burdens religious exercise pursuant to a policy that is not religiously neutral, courts will find a constitutional violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525. The displays required under S.B. 10 are not neutral with respect to religion. By design, the Act mandates the display of expressly religious scripture, the Ten Commandments, in every

public-school classroom and, moreover, requires that a specific Protestant version of that scripture be used.

237.    Further, under the Free Exercise Clause, a public school "burdens the religious exercise of parents" where, as here, "it requires them to submit their children to instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill." *Mahmoud*, 145 S. Ct. at 2342 (cleaned up). Given the nature of this burden, courts "need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Id.* at 2361.

238.    The displays mandated by S.B. 10 will not further a compelling governmental interest and, even if they did, they are not narrowly tailored to any such interest under the Free Exercise Clause.

239.    By administering and implementing S.B. 10, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Free Exercise Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and under 42 U.S.C. § 1983.

240.    Plaintiffs have no adequate remedy at law for the denial of their fundamental Free Exercise Clause rights.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request the following relief:

A.    An order declaring that S.B. 10 violates the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution;

B.    A temporary restraining order and an order preliminarily and, thereafter, permanently enjoining the Defendants and their officers, agents, affiliates, subsidiaries, servants,

employees, successors, and all other persons or entities in active concert or privity or participation with them, from complying with S.B. 10 by displaying the Ten Commandments in public elementary and secondary school classrooms;

C. To the extent that any Defendants have already displayed the Ten Commandments in public-school classrooms pursuant to S.B. 10, a temporary restraining order and an order preliminarily and, thereafter, permanently requiring such Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, to remove such displays;

D. An award, from Defendants to Plaintiffs, of reasonable attorneys' fees and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988;

E. An order retaining this Court's jurisdiction of this matter to enforce the terms of the Court's order; and

F. Such other relief as the Court deems just and proper.

DATED: September 22, 2025　　　　　Respectfully submitted,

By: */s/ Jonathan K. Youngwood*
SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
Janet A. Gochman*
Noah Gimbel*
Jordan T. Krieger*
Avia Gridi*
Kristen Crow*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
*jyoungwood@stblaw.com*
*jgochman@stblaw.com*
*noah.gimbel@stblaw.com*
*jordan.krieger@stblaw.com*
*avia.gridi@stblaw.com*

*kristen.crow@stblaw.com*

AMERICAN CIVIL LIBERTIES UNION
OF TEXAS FOUNDATION, INC.
Adriana Piñon
Thomas Buser-Clancy
Sarah Corning*
Chloe Kempf
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
*apinon@aclutx.org*
*tbuser-clancy@aclutx.org*
*scorning@aclutx.org*
*ckempf@aclutx.org*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
Daniel Mach*
Heather L. Weaver*
915 15th Street, NW, Suite 600
Washington, DC 20005
(202) 675-2330
*dmach@aclu.org*
*hweaver@aclu.org*

AMERICANS UNITED FOR
SEPARATION OF CHURCH & STATE
Alex J. Luchenitser*
Amy Tai*^
Jess Zalph*
Alexandra Zaretsky*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*
*tai@au.org*
*zalph@au.org*
*zaretsky@au.org*

FREEDOM FROM RELIGION
FOUNDATION
Patrick C. Elliott
Samuel T. Grover
Nancy A. Noet*
P.O. Box 750

Madison, WI 53701
(608) 256-8900
*patrick@ffrf.org*
*sgrover@ffrf.org*
*noetn@ffrf.org*

*Counsel for Plaintiffs*

\* Motion for *Pro Hac Vice* Admission
Forthcoming

^ Admitted to practice in New York; not a
member of the D.C. Bar.